ARTHUR WINSLEY, *Plaintiff in Error,* v. THE STATE OF FLORIDA, *Defendant in Error.*

Opinion Filed April 13, 1915.

CRIMINAL LAW—NEW TRIAL ON GROUND OF NEWLY DIS-
COVERED EVIDENCE.

Two requirements, among others, of the rule for the granting of new trials on the ground of newly discovered evidence are that the alleged newly discovered evidence must be such as would probably produce a different result on the second trial, and (2) such alleged newly discovered evidence must be material to the issues. Where on a motion for new trial on the ground of newly discovered evidence, and affidavit was produced made by a person who had given material evidence against the defendant on the trial, which stated in substance that the newly discovered witness and affiant had committed perjury in testifying as she did at the trial, the Court properly declined to set aside the verdict, or to grant a new trial, on account of it. Particularly is this true when the alleged newly discovered evidence is immaterial to any issue in the case.

Writ of error to Circuit Court, Clay County; Geo. Couper Gibbs, Judge.

Judgment affirmed.

*A. H. Bell,* for Plaintiff in Error;

*T. F. West, Attorney General,* and *C. O. Andrews, Assistant,* for the State.

TAYLOR, C. J.—The plaintiff in error was indicted, tried and convicted of the crime of murder in the first degree

in the Circuit Court of Clay County and sentenced to die, and seeks a reversal of such judgment here on writ of error.

This being a case where the death penalty has been imposed, we have given the record careful consideration and will discuss the contentions made in the brief and argument of the plaintiff in error in the order in which they are there presented.

After a careful consideration of the evidence, we have no hesitancy in arriving at the conclusion that the verdict returned by the jury is abundantly supported thereby.

The testimony is ample to support the existence of premeditated design on the part of the accused to kill not only the deceased woman that he slew, but another woman, the daughter of the deceased, and a man the husband of the deceased. The evidence shows that after going to the house of the deceased three different times demanding money from the daughter of the deceased, that she exhibited some hesitancy and reluctance in giving to him, he went off and armed himself with a revolver, and returned for the fourth time and began an indiscriminate shooting at all three, the deceased, her husband and her daughter, the latter of whom had been illicitly living with him for sometime, in which shooting he wounded all three of them, the wounds given the deceased only resulting fatally, and this after a threat made by the accused of his intention to kill out the entire family. Some effort was made to show that the accused was so much under the influence of intoxicants that he was too drunk to know what he was doing or to form a premeditated design to kill the deceased. But there is abundant evidence by several witnesses in the record showing that while the accused

had been and was drinking intoxicants, he was not so drunk as to prevent his knowing what he was doing or to incapacitate him from knowing right from wrong.

It is next contended that the court below should have granted the defendant's motion for new trial on the ground of newly discovered evidence. The alleged newly discovered evidence was as follows according to the affidavit of one Mary Wesley, a witness for the State, made and presented on behalf of the defendant in support of his motion for new trial:

"Before me personally appeared Mary Wesley, formerly Mary Winsley, who being first duly sworn on oath says that she is the same person who testified in the case for the State against Arthur Winsley, trial held on the 30th day of October A. D. 1914, that she testified in that case that Sam Calloway so far as she remembered did not start for a gun, but she now recalls that the said Sam Calloway when he ran in the house did make a dash for the gun. He and Arthur were standing in the door arguing and he whirled around to where the gun was or towards the gun as if it was his intentions. This was before anyone got shot or before Arthur shot the first time. Sam acted like he intended to get the gun."

This affiant had been one of the State's chief witnesses and was examined in chief and cross-examined by the defendants counsel at great length, and on her cross-examination testified with reference to Calloway and the gun in the house as follows: "Q. Did Sam Calloway have a gun in the house? A. Yes, sir. Q. There was a gun in the house? A. Yes, sir. Q. What kind of a gun was it in the house? A. He had a breech loading gun, shot gun in the house. Q. Sam Calloway did run into the

house didn't he? A. He whirled to go in the house. Q. And there was a gun in the house? A. Yes sir. Q. You don't know whether he was going to get the gun or not, do you? A. No, sir; I don't know what he was coming in the house for. Q. Where was that gun all that time? A. Which gun? Q. In the house? A. It was upon a pair of springs up overhead. Q. You all didn't take it down? A. No, sir. Q. Sam Calloway ran in that house and was going towards the doorway when he was shot? A. He was standing in the door, and turned to come in the house. Q. You don't know whether he was going after that gun or not? A. No, sir. Q. You don't know whether he said he was going after it or not? A. No, sir."

It will be seen from these questions and answers that the effort of the defense was to show by this witness that Sam Calloway the deceased's husband went into the house for the evident purpose of securing this shotgun, but in answer to the pointed question: "You don't know whether he was going after that gun or not?" She answered: "No, she did not." Afterwards in her affidavit filed in support of the defendant's motion for new trial on the ground of newly discovered evidence she practically perjures herself by saying that Sam Calloway when he ran in the house did make a dash for the gun. Sam acted like he intended to get the gun. One of the rules for the granting of new trials on the ground of newly discovered evidence is that the alleged newly discovered evidence must be such as would probably produce a different result on the second trial. The statements of this witness as contained in her affidavit quoted above when held up in juxtaposition to her evidence on the same subject matter at the trial, would not be likely to impress the jury at another trial with

much credence in her veracity, and would not therefore, with any degree of probability produce a different result.

In the case of The People *ex rel.* Stemmler v. McGuire, 2 Hun (N. Y.) 269, it was held that "where on a motion for new trial, on the ground of newly discovered evidence, an affidavit was produced, made by a person who had given material evidence in the plaintiff's favor on the trial, which stated in substance that the witness had committed perjury in testifying as he did, the court properly declined to set aside the verdict on account of it. But besides this, the alleged newly discovered evidence was not material to the issue. The defendant was on trial, not for the killing of Sam Calloway, but of his wife, whom he shot in her own house, after her husband had left the house, and there is no pretense that she was shot by the defendant under any circumstances that would justify him in setting up the defense of self-defense. The sixth ground of the motion for new trial is that the court erred in allowing the jury to return to the court room, and reconvening court, after the jury retired and were considering their verdict and before their verdict was made up, and when the counsel for the defendant was not present and without his knowledge.

This ground of the motion for new trial the judge below in the bill of exceptions certifies is substantially true, and certifies to the following facts as then transpiring: That at a late hour in the night he announced a recess of the court until the following morning, but a few minutes after such announcement conceiving the possibility of the jury desiring further instructions on the law of the case reconvened the court, and sent for the jury who returned into court at 11:10 o'clock p. m., when the court propounded the following questions receiving the follow-

ing replies from the foreman of the jury: "Q. Gentlemen, have you agreed upon a verdict? A. No, sir. Q. Gentlemen, is there any matter of law that you would care to have the court instruct you further on? A. I don't think so. The Court—Gentlemen, then I shall have to ask you to retire to further consider your verdict; I have asked you to come in in the hope that there might be some question of law in your minds. I cannot instruct you except as to matters of law." Thereupon the jury retired to further consider the verdict. The prisoner was personally present during this colloquy between the trial judge and the jury, but his counsel was not present. There may have been slight irregularity in announcing a recess until next day, and then immediately reconvening the court and sending for the jury in the absence of the prisoner's counsel, but from what actually transpired between the trial judge and the jury we cannot conceive how any harm could possibly have resulted to the defendant therefrom, nor how the result of the trial could have been in the least affected thereby. Finding no error in any of the proceedings complained of, the judgment of the Circuit Court in said cause is hereby affirmed at the cost of Clay County, the plaintiff in error having been adjudged to be insolvent.

SHACKLEFORD, COCKRELL, WHITFIELD AND ELLIS, JJ., concur.